# In the United States Court of Appeals for the Federal Circuit

BOEHRINGER INGELHEIM PHARMACEUTICALS INC., BOEHRINGER INGELHEIM INTERNATIONAL GMBH, BOEHRINGER INGELHEIM CORPORATION, *and* BOEHRINGER INGELHEIM PHARMA GMBH & CO. KG,

*Plaintiffs–Appellants,*

*v.*

MYLAN PHARMACEUTICALS INC., MYLAN INC., MYLAN LABORATORIES LIMITED, AUROBINDO PHARMA LIMITED, *and* AUROBINDO PHARMA USA, INC.,

*Defendants–Appellees.*

On Appeal from the U.S. District Court for the District of New Jersey, Case Nos. 3:15-cv-05982-PGS-TJB, 3:16-cv-00851-PGS-TJB, 3:16-cv-00852-PGS-TJB, 3:16-cv-01727-PGS-TJB, 3:16-cv-02394-PGS-TJB

## CORRECTED BRIEF OF APPELLEES
## [NON-CONFIDENTIAL]

Jeffrey S. Ward
Wendy M. Ward
GREEN, GRIFFITH & BORG-BREEN LLP
8215 Greenway Blvd. – Suite 220
Middleton, WI 53562
Tel.: 312-883-8000
jward@greengriffith.com
wward@greengriffith.com

*Counsel for Aurobindo Pharma Ltd. and Aurobindo Pharma USA, Inc.*

Deepro R. Mukerjee
Lance A. Soderstrom
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022
Tel.: 212-940-6330
deepro.mukerjee@kattenlaw.com
lance.soderstrom@kattenlaw.com

*Counsel for Mylan Pharmaceuticals Inc., Mylan Inc., and Mylan Laboratories Ltd.*

*Additional counsel on the inside cover*

Corrected: July 1, 2019

Paige Stradley
MERCHANT & GOULD P.C.
80 S. Eighth Street – Suite 3200
Minneapolis, MN 55402
Tel.: 612-336-4671
pstradley@merchantgould.com

*Counsel for Aurobindo Pharma Ltd. and
Aurobindo Pharma USA, Inc.*

Howard R. Rubin
Eric T. Werlinger
Rajesh R. Srinivasan
KATTEN MUCHIN ROSENMAN LLP
2900 K Street, NW – Suite 200
Washington, DC 20007
Tel.: 202-625-3500
howard.rubin@kattenlaw.com
eric.werlinger@kattenlaw.com
rajesh.srinivasan@kattenlaw.com

Joseph M. Janusz
KATTEN MUCHIN ROSENMAN LLP
550 South Tryon St. – Suite 2900
Charlotte, NC 28202
Tel.: 704-444-2000
joseph.janusz@kattenlaw.com

Thomas J. Parker
Christopher L. McArdle
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
Tel: 212-210-9400
thomas.parker@alston.com
chris.mcardle@alston.com

*Counsel for Mylan Pharmaceuticals Inc.,
Mylan Inc., and Mylan Laboratories Ltd.*

# CERTIFICATE OF INTEREST

Counsel for Appellees certifies the following:

**1. The full name of every party represented by us is:**

Mylan Pharmaceuticals Inc., Mylan Inc., Mylan Laboratories Limited, Aurobindo Pharma Limited, and Aurobindo Pharma USA, Inc.

**2. The name of the real party in interest represented by us is:**

Mylan Pharmaceuticals Inc., Mylan Inc., Mylan Laboratories Limited, Aurobindo Pharma Limited, and Aurobindo Pharma USA, Inc.

**3. All parent corporations and any other publicly held companies that own 10 percent or more of the stock of the party represented by us are:**

Mylan Pharmaceuticals Inc. and Mylan Laboratories Ltd. are wholly owned subsidiaries of Mylan Inc. Mylan Inc. is a wholly owned subsidiary of Mylan N.V. No publicly held corporation owns more than 10% of Mylan N.V.

Aurobindo Pharma USA, Inc. is a wholly owned subsidiary of Aurobindo Pharma Limited. No publicly held corporation owns more than 10% of Aurobindo Pharma Limited.

**4. The names of all law firms and the partners and associates that have appeared for the party in the lower tribunal or are expected to appear for the party in this court and who are not already listed on the docket for the current case are:**

SAIBER LLC: Arnold B. Calmann, Geri L. Albin, and Jeffrey S. Soos.

BUCHANAN INGERSOLL & ROONEY PC: Philip L. Hirschhorn.

**5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:**

- None. The cases identified on Defendants' Initial Disclosure settled and are no longer pending.

Dated: July 1, 2019

/s/ Jeffrey S. Ward

Jeffrey S. Ward
GREEN, GRIFFITH
& BORG-BREEN LLP
8215 Greenway Blvd. – Suite 220
Middleton, WI 53562
Tel.: 312-883-8000
jward@greengriffith.com

/s/ Deepro R. Mukerjee

Deepro R. Mukerjee
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022
Tel.: 212-940-6330
Fax: 212-940-8776
deepro.mukerjee@kattenlaw.com

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ...................................................................i

STATEMENT CONCERNING CONFIDENTIAL MATERIAL ............................ v

TABLE OF AUTHORITIES ................................................................. vi

STATEMENT OF RELATED CASES ........................................................xi

INTRODUCTION ........................................................................... 1

ISSUES PRESENTED ...................................................................... 4

STATEMENT OF FACTS ................................................................... 5

A.  Boehringer Patents the Linagliptin Compound: The '510 Publication and the '955 Patent.................................................................... 5

B.  Boehringer Patents Methods of Treating Type-2 Diabetes With Linagliptin: The '648 and '541 Patents................................................. 6

C.  Boehringer Files Two More Patents for a Method of Treating Type-2 Diabetes With Linagliptin: The '927 and '859 Patents. ........................... 7

D.  Boehringer Files Another Linagliptin Patent: The '156 Patent............................. 8

E.  Procedural History...................................................................... 9

SUMMARY OF ARGUMENT ............................................................. 12

STANDARD OF REVIEW................................................................. 16

ARGUMENT................................................................................ 17

I.  THE DISTRICT COURT CORRECTLY FOUND THAT THE '859 AND '927 PATENTS ARE INVALID ............................................................... 17

    A.  The Evidence Supports the District Court's Finding that the '859 and '927 Patents Were Prima Facie Invalid for Obviousness-Type Double Patenting................................................................................ 18

        1.  The claimed dosages fall within ranges disclosed by Boehringer's own prior art............................................................................. 20

        2.     A skilled artisan would have arrived at the dosages through a dose-ranging study .................................................................................. 26

    B.    The Evidence Also Supports the Conclusion that the '859 and '927 Patents' Linagliptin Dosages Were Prima Facie Obvious Based on the '510 Publication .......................................................................... 31

    C.    The District Court Correctly Assessed and Rejected Boehringer's Evidence of Secondary Considerations ...................................................... 33

II.    THE '156 PATENT CLAIMS INELIGIBLE SUBJECT MATTER ........................... 38

    A.    The Asserted Claims Are Directed to the Natural Law that Certain DPP-IV Inhibitors Are Metabolized by the Liver ................................... 39

          1.     The claims and specification of the '156 Patent demonstrate that the claimed "advance" over the prior art is a natural law ............ 39

          2.     Unlike the patent-eligible claims in *Vanda* and its progeny, the '156 Patent claims are not directed to a novel treatment ..................... 44

          3.     Boehringer's argument that claims to "methods of treatment" are per se patentable is contrary to law ................................................. 46

    B.    The Asserted Claims are Unpatentable at Step Two of *Mayo*, Because the Claimed Method Steps Add Only the Conventional Administration of DPP-IV Inhibitors ....................................................................... 48

          1.     Boehringer's specification teaches that oral administration of DPP-IV inhibitors to treat type-2 diabetes is conventional ......... 48

          2.     There were no relevant factual disputes that precluded dismissal on the pleadings ....................................................................... 53

CONCLUSION ........................................................................................... 56

CERTIFICATE OF SERVICE ......................................................................... 58

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION ..... 59

CERTIFICATE OF COMPLIANCE FOR BRIEFS CONTAINING MATERIAL SUBJECT TO A PROTECTIVE ORDER ................................. 60

# STATEMENT CONCERNING CONFIDENTIAL MATERIAL

Pages 12 and 37 of this brief contain confidential and proprietary business and financial information regarding the marketing and sales of Boehringer's products TRADJENTA® and JENTADUETO®, which was designated Highly Confidential in the district court because it constitutes highly sensitive proprietary business and financial information.

# TABLE OF AUTHORITIES

**CASES:**

*Aatrix Software, Inc. v. Green Shades Software, Inc.,*
    882 F.3d 1121 (Fed. Cir. 2018)...................................................... 55

*Affinity Labs of Tex., LLC v. DirecTV, LLC,*
    838 F.3d 1253 (Fed. Cir. 2016)................................................ 39, 40

*Agfa Corp. v. Creo Prods. Inc.,*
    451 F.3d 1366 (Fed. Cir. 2006)...................................................... 27

*Alice Corp. Pty. v. CLS Bank Int'l,*
    134 S. Ct. 2347 (2014) ................................................................... 49

*Allergan, Inc. v. Athena Cosmetics, Inc.,*
    640 F.3d 1377 (Fed. Cir. 2011)...................................................... 17

*Allergan, Inc. v. Sandoz Inc.,*
    796 F.3d 1293 (Fed. Cir. 2015)................................................ 24, 25

*Anderson v. City of Bessemer City, N.C.,*
    470 U.S. 564 (1985)........................................................................ 16

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.,*
    788 F.3d 1371 (Fed. Cir. 2015)...................................................... 49

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.,*
    569 U.S. 576 (2013)........................................................................ 42

*Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC,*
    915 F.3d 743 (Fed. Cir. 2019)....................... 17, 40, 43, 52, 54

*Bausch & Lomb, Inc. v. Barnes Hind/Hydrocurve, Inc.,*
    796 F.2d 443 (Fed. Cir. 1986)....................................................... 34

*Bayer Pharma AG v. Watson Labs., Inc.,*
    874 F.3d 1316 (Fed. Cir. 2017)...................................................... 25

*Berkheimer v. HP Inc.,*
    881 F.3d 1360 (Fed. Cir. 2018)................................................ 54, 55

*BSG Tech LLC v. Buyseasons, Inc.*,
  899 F.3d 1281 (Fed. Cir. 2018)..........................................................53, 54

*ChargePoint, Inc. v. SemaConnect, Inc.*,
  920 F.3d 759 (Fed. Cir. 2019) .................................................................. 40

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
  760 F. App'x 1013 (Fed. Cir. 2019) ......................................................50, 53

*CyberSource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011)................................................................. 48

*Diamond v. Diehr*,
  450 U.S. 175 (1981)................................................................................. 51

*Easley v. Cromartie*,
  532 U.S. 234 (2001)................................................................................. 32

*Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*,
  533 F.3d 1353 (Fed. Cir. 2008)................................................................ 32

*Eli Lilly & Co. v. Barr Labs., Inc.*,
  251 F.3d 955 (Fed. Cir. 2001) ................................................................. 19

*Endo Pharms. Inc. v. Teva Pharms. USA, Inc.*,
  919 F.3d 1347 (Fed. Cir. 2019)............................................................45, 46

*Energy Capital Corp. v. United States*,
  302 F.3d 1314 (Fed. Cir. 2002)............................................................26, 27

*Fromson v. Citiplate, Inc.*,
  886 F.2d 1300 (Fed. Cir. 1989)................................................................ 16

*Funk Bros. Seed Co. v. Kalo Inoculant Co.*,
  333 U.S. 127 (1948)................................................................................. 51

*Galderma Labs., L.P. v. Tolmar, Inc.*,
  737 F.3d 731(Fed. Cir. 2013) ................................................13, 20, 21, 22, 30

*Genetic Techs. Ltd. v. Merial L.L.C.*,
  818 F.3d 1369 (Fed. Cir. 2016)............................................................40, 42

*Genetics Institute, LLC v. Novartis Vaccines & Diagnostics, Inc.*,
    655 F.3d 1291 (Fed. Cir. 2011)............................................................ 23, 24

*Genzyme Therapeutic Prod. Ltd. P'ship v. Biomarin Pharm. Inc.*,
    825 F.3d 1360 (Fed. Cir. 2016)................................................................ 26

*Hanover Ins. Co. v. Urban Outfitters, Inc.*,
    806 F.3d 761 (3rd Cir. 2015).................................................................. 17

*In re Chupp*,
    816 F.2d 643 (Fed. Cir. 1987)................................................................ 36

*In re Cyclobenzaprine Hydrochloride Extended–Release Capsule Patent Litig.*,
    676 F.3d 1063 (Fed. Cir. 2012)............................................................... 33

*In re Harris,*
    409 F.3d 1339, 1344 (Fed. Cir. 2005) ..................................................... 36

*In re Merck,*
    800 F.2d 1091 (Fed. Cir. 1986)............................................................... 36

*In re Peterson,*
    315 F.3d 1325 (Fed. Cir. 2003).................................................... 13, 20, 22

*In re Sarkar,*
    588 F.2d 1330 (C.C.P.A. 1978)............................................................... 48

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*,
    821 F.3d 1359 (Fed. Cir. 2016)............................................................... 43

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
    392 F.3d 1317 (Fed. Cir. 2004)............................................................... 20

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
    424 F.3d 1324 (Fed. Cir. 2005)......................................................... 30, 31

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)............................................................................... 30

*Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*,
    485 F.3d 1157 (Fed. Cir. 2007)............................................................... 32

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
566 U.S. 66 (2012)..............................................15, 16, 38, 39, 46, 47, 49, 51, 52, 55

*Metro. Edison Co. v. Pa. PUC*,
767 F.3d 335 (3rd Cir. 2014) ............................................................... 52

*Natural Alternatives Int'l, Inc. v. CreativeCompounds, LLC.*,
918 F.3d 1338 (Fed. Cir. 2019) ........................................................ 45, 46

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
719 F.3d 1346 (Fed. Cir. 2013) ........................................................ 15, 33

*Ormco Corp. v. Align Tech., Inc.*,
463 F.3d 1299 (Fed. Cir. 2006) ............................................................. 25

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*,
806 F.2d 1565 (Fed. Cir. 1986) ............................................................. 17

*Palantir USG, Inc. v. United States*,
904 F.3d 980 (Fed. Cir. 2018) .............................................................. 43

*Parker v. Flook*,
437 U.S. 584 (1978)............................................................................. 47

*Perfect Web Techs., Inc. v. InfoUSA, Inc.*,
587 F.3d 1324 (Fed. Cir. 2009) ............................................................. 37

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007).............................................17, 18, 26, 33, 34, 35

*Pfizer, Inc. v. Teva Pharm. USA, Inc.*,
518 F.3d 1353 (Fed. Cir. 2008)............................................................. 19

*Prometheus Labs., Inc. v. Mayo Collaborative Servs.*,
628 F.3d 1347 (Fed. Cir. 2010)............................................................. 47

*Prometheus Labs., Inc. v. Roxane Labs., Inc.*,
805 F.3d 1092 (Fed. Cir. 2015)......................................................17, 18, 33

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*,
827 F.3d 1042 (Fed. Cir. 2016) ............................................................. 48

*Santarus, Inc. v. Par Pharm., Inc.*,
    694 F.3d 1344 (Fed. Cir. 2012) ...................................................................... 37

*Source Search Techs., LLC v. LendingTree, LLC*,
    588 F.3d 1063 (Fed. Cir. 2009) ...................................................................... 22

*Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.*,
    611 F.3d 1381 (Fed. Cir. 2010) ................................................................. 18, 19

*Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*,
    988 F.2d 1165 (Fed. Cir. 1993) ...................................................................... 36

*Tyco Healthcare Grp. LP v. Mut. Pharm. Co., Inc.*,
    642 F.3d 1370 (Fed. Cir. 2011) ....................................................... 13, 20, 21, 30

*UCB, Inc. v. Accord Healthcare, Inc.*,
    890 F.3d 1313 (Fed. Cir. 2018) ................................................................. 19, 20

*Vanda Pharms. Inc. v. West-Ward Pharms. Int'l Ltd.*,
    887 F.3d 1117 (Fed. Cir. 2018) .......................................................4, 15, 44, 45

*Warner Chilcott Co., LLC v. Teva Pharm. USA, Inc.*,
    89 F. Supp. 3d 641 (D.N.J. 2015) ................................................................. 21, 22

*ZUP, LLC v. Nash Mfg., Inc.*,
    896 F.3d 1365 (Fed. Cir. 2018) ...................................................................... 33

## STATUTES:

35 U.S.C. § 101 ...................................3, 4, 9, 15, 38, 39, 43, 45, 46, 47, 54, 55, 56

35 U.S.C. § 102(a) .......................................................................................... 25

35 U.S.C. § 103 (2012) .................................................................................... 31

35 U.S.C. § 282(a) .......................................................................................... 17

# STATEMENT OF RELATED CASES

The case from which this appeal was taken was consolidated with the following cases in the U.S. District Court for the District of New Jersey:

- *Boehringer Ingelheim Pharms. Inc. et al. v. HEC Pharm Co., Ltd. et al.,* 3:15-cv-05982 (D.N.J.)

- *Boehringer Ingelheim Pharms. Inc. et al. v. Prinston Pharm. Inc. et al.,* 3:16-cv-00851 (D.N.J.)

- *Boehringer Ingelheim Pharms. Inc. et al. v. Accord Healthcare, Inc. et al.,* 3:16-cv-00852 (D.N.J)

- *Boehringer Ingelheim Pharms. Inc. et al. v. Sun Pharm. Indus. Ltd. et al.,* 3:16-cv-01727 (D.N.J.)

- *Boehringer Ingelheim Pharms. Inc. et al. v. Dr. Reddy's Labs., Ltd. et al.,* 3:16-cv-02394 (D.N.J.)

No appeal was previously taken from these proceedings. Counsel is unaware of any other cases pending in this or any other court that would directly affect or be directly affected by this Court's decision in this appeal.

# INTRODUCTION

This case is not about Boehringer's efforts to develop linagliptin.[1] Boehringer Br. 6-12. Boehringer has already received a compound patent (U.S. Patent No. 7,407,955 or "the '955 Patent") and two method-of-treatment patents (U.S. Patent No. 8,178,541 or "the '541 Patent" and U.S. Patent No. 8,119,648 or "the '648 Patent") for linagliptin. Those patents are not asserted in this litigation and are not set to expire until 2025 at the latest. At issue is whether Boehringer may effectively extend its patent monopoly by obtaining three more serially-filed patents that add nothing patentable to its prior inventions. The answer is no.

Boehringer's '541 and '648 Patents claim methods of treating type-2 diabetes using "a pharmaceutically effective amount" of linagliptin, both in conjunction with metformin (the '541 Patent) and without metformin (the '648 Patent). In an attempt to evergreen these patents, Boehringer subsequently filed for U.S. Patent Nos. 9,173,859 ("the '859 Patent") and 8,673,927 ("the '927 Patent"). Both claim the same basic method of treating type-2 diabetes with linagliptin, only this time with specific 2.5 and 5 mg oral dosages. These patents would have extended Boehringer's monopoly over linagliptin until 2027.

---

[1] Appellants are referred to collectively as "Boehringer." Appellees are referred to individually as "Mylan" and "Aurobindo" and collectively as "Defendants."

The district court saw through Boehringer's attempt to extend the terms of its prior patents and invalidated the '859 and '927 Patents following a seven-day bench trial. The lower court's decision rested principally upon a finding of obviousness-type double patenting, using the '541 Patent as a reference for the use of linagliptin to treat type-2 diabetes. The district court found that the key difference between the reference claims and those asserted from the '859 and '927 Patent was the 2.5 and 5 mg linagliptin dosages. The court found those dosages to be prima facie obvious over U.S. Patent Publication No. 2004/0097510 ("the '510 Publication"), the patent application that spawned Boehringer's '955, '541, and '648 Patents. The district court separately held that the '859 and '927 Patents' claims were prima facie obvious over the '510 Publication because that publication alone would have motivated a skilled artisan to study linagliptin as a type-2 diabetes treatment. After carefully assessing and rejecting Boehringer's evidence of secondary considerations, the district court invalidated both patents.

Boehringer's argument on appeal reduces down to dissatisfaction with the district court's fact-finding and credibility determinations. Conflating the two independent and sufficient grounds for invalidating the '859 and '927 Patents, Boehringer assails the district court's reliance upon the '510 Publication because the preferred range revealed in that document applies to several thousand DPP-IV inhibitors (including linagliptin) for the treatment of numerous diseases (including type-2 diabetes). But Boehringer ignores the fact that linagliptin is explicitly recited and claimed by the '541 Patent. Thus, the district court did not need to assess whether a

skilled artisan would have selected linagliptin from the '510 Publication; it needed to decide only whether she would have applied the '510 Publication's dosage range to linagliptin. With respect to its traditional obviousness analysis, the district court made detailed factual findings about the skilled artisan's motivation to study linagliptin as one of the most potent and "preferred" compounds discussed in the '510 Publication.

Under both approaches, the district court correctly weighed the evidence and concluded that Defendants had established a prima facie case of invalidity. The court also properly considered and rejected Boehringer's evidence of secondary considerations before invalidating the patents.

Boehringer's U.S. Patent No. 8,853,156 ("the '156 Patent"), which expires in 2031, represents another failed attempt to evergreen its portfolio. The '156 Patent claims, yet again, a method of treating type-2 diabetes with linagliptin. The '156 Patent's only claimed "improvement" over prior, conventional technology was the purported "discovery" of the natural law that humans excrete certain DPP-IV inhibitors primarily through their livers rather than through their kidneys.

The district court recognized that this "advance" did not represent patentable subject matter under 35 U.S.C. § 101 and granted judgment on the pleadings. Guided by applicable Supreme Court and Federal Circuit precedent, the district court focused on the differences between the '156 Patent and the prior art and determined that the heart of the asserted claims was the natural law governing the excretion of DPP-IV inhibitors from the human body.

Boehringer does not directly challenge that conclusion on appeal. Instead, Boehringer points to this Court's decision in *Vanda Pharmaceuticals Inc. v. West-Ward Pharmaceuticals International Ltd.* and contends that the '156 Patent is per se patent eligible because it purports to claim a method of treatment. But Boehringer's expansive reading stretches *Vanda* past its breaking point. *Vanda* and recent decisions applying it hold only that *innovative* dosage regimens or treatment steps may be patent eligible, even if they are based on natural laws. The '156 Patent does not fit within this rule because the claimed method of treatment is not innovative: it simply reveals that DPP-IV inhibitors, including linagliptin, can be administered to patients with renal conditions because the body metabolizes these drugs via the liver, not the kidneys. Aside from the "discovery" of these pharmacokinetic properties, the '156 Patent's claims contain no unconventional elements that transform them into patentable inventions. Accordingly, the district court correctly deemed the asserted claims ineligible under § 101.

## ISSUES PRESENTED

1. Following a bench trial, did the district court make clearly erroneous findings in its decision to invalidate Boehringer's '859 and '927 Patents for obviousness-type double patenting and for obviousness?

2. Are the asserted claims of Boehringer's '156 Patent ineligible under § 101 because their only inventive aspect is a direction to apply the natural law that humans excrete DPP-IV inhibitors primarily through their livers rather than through their kidneys?

## STATEMENT OF FACTS

**A.    Boehringer Patents the Linagliptin Compound: The '510 Publication and the '955 Patent.**

Linagliptin is part of a family of drugs known as DPP-IV inhibitors. These drugs have generally been known in the art for decades and have specifically been known to be useful in treating metabolic disorders such as type-2 diabetes since at least 1998. Appx964 at 519:15-520:8. Since the early 2000s, Boehringer has worked to build a web of patents covering linagliptin. The compound itself is claimed in the '955 Patent, which was first published in May 2004 as the '510 Publication. Appx1525.

The '510 Publication discloses a number of DPP-IV inhibitors (most notably linagliptin), which "have valuable pharmacological properties" for "the prevention or treatment of diseases or conditions associated with an increased DPP-IV activity or capable of being prevented or alleviated by reducing the DPP-IV activity, particularly type I or type II diabetes mellitus." Appx1526 at ¶ 0004; Appx1536 at ¶ 0297.

Though the '510 Publication lists thousands of DPP-IV inhibitors, linagliptin is listed among the thirty "[m]ost particularly preferred" compounds revealed in the '510 Publication. Appx1533 at ¶¶ 0232, 0245. Further, linagliptin is one of the six most potent DPP-IV inhibitors covered by the publication, with an $IC_{50}$ value of 1 nm. Appx1536 at ¶ 0295. The '510 Publication also provides narrow, preferred dosages for these DPP-IV inhibitors. Appx1532 at ¶ 0297; Appx1537 at ¶ 0300. For oral

administration, it teaches dosages of "preferably 1 to 100 mg" administered "1 to 4 times a day." Appx1537 at ¶ 0300.

## B. Boehringer Patents Methods of Treating Type-2 Diabetes With Linagliptin: The '648 and '541 Patents.

Boehringer later filed patent applications that would become the '648 and '541 Patents. Appx1409, Appx10076. These applications were continuations of the '955 Patent, which was published as the '510 Publication. Appx1409, Appx10076. As a result, the specifications of both patents are identical to the '510 Publication's. Appx1409-1479, Appx1525-1591, Appx10082-10134.

Like the '510 Publication, the '648 and '541 Patents relate to DPP-IV inhibitors and claim pharmaceutical compositions of Boehringer's linagliptin product and a method of treating type-2 diabetes using that composition. The '648 Patent claims "method[s] of treating type II diabetes mellitus or obesity comprising administering to a patient in need thereof a pharmaceutically effective amount" of a DPP-IV inhibitor or, specifically, linagliptin. Appx10134 at 106:2-27. The '541 Patent claims both a "pharmaceutical composition comprising [linagliptin] and metformin" and a "method of treating type II diabetes mellitus comprising administering to a patient in need thereof a pharmaceutically effective amount of [linagliptin] and metformin." Appx1482 at 135:4-11.

**C. Boehringer Files Two More Patents for a Method of Treating Type-2 Diabetes With Linagliptin: The '927 and '859 Patents.**

In 2010, about two-and-a-half years after filing for the '648 and '541 Patents, Boehringer filed for what would become the first patent at issue in this case—the '927 Patent. Appx178-200. The invention relates to "the use of selected DPP-IV inhibitors for the treatment of physiological functional disorders and for reducing the risk of the occurrence of such functional disorders in at-risk patient groups." Appx179.

Boehringer identifies two illustrative claims from the '927 Patent, both of which depend on Claim 1 and recite linagliptin in specific dosages. Claim 1 recites a "method of treating type II diabetes mellitus comprising administering to a patient in need thereof a pharmaceutically effective oral amount of [linagliptin] and a pharmaceutically effective amount of metformin." Appx199 at 23:46-51. Claim 7 recites the "method according to claim 1, wherein the [linagliptin] is administered in an oral dosage of 2.5 mg or 5 mg," while Claim 9 limits the dose to 5 mg. Appx199 at 24:9-12, 17-20.

Four years after filing for the '927 Patent, Boehringer filed an application seeking yet another method-of-use patent covering linagliptin. This application issued as the '859 Patent. Appx228-251. Boehringer again identifies two illustrative claims from the '859 Patent. Claim 14 recites an "oral tablet formulation comprising [linagliptin] in an amount of 2.5 mg or 5 mg optionally in combination with metformin, and a pharmaceutically acceptable carrier or diluent." Appx251 at 24:16-20. Claim 20 is

dependent on claim 14 and limits the daily oral amount of linagliptin to 5 mg. Appx251 at 24:54-58.

## D.    Boehringer Files Another Linagliptin Patent: The '156 Patent.

In 2009, Boehringer filed an application for yet another method-of-treatment patent, which issued as the '156 Patent. Appx201-227. Similar to Boehringer's prior patents, the '156 Patent "relates to certain DPP-4 inhibitors for treating and/or preventing metabolic diseases," especially "type 2 diabetes mellitus," in "patients for whom normal metformin therapy is not appropriate (due to intolerability or contraindication against metformin)." Appx212 at 1:5-10.

Boehringer asserted claims 10-17, 24 and 25. Claims 10-17 depend on Claim 1, which recites:

> A method of treating and/or preventing metabolic diseases in a patient for whom metformin therapy is inappropriate due to at least one contraindication against metformin comprising orally administering to the patient a DPP-IV inhibitor wherein the contraindication is selected from the group consisting of: renal disease, renal impairment or renal dysfunction, unstable or acute congestive heart failure, acute or chronic metabolic acidosis, and hereditary galactose intolerance.

Appx226 at 29:2-11. Claim 10 recites the "method according to claim 1 wherein the metabolic disorder is type 2 diabetes mellitus and wherein the contraindication is renal disease, renal impairment or renal dysfunction, and wherein said DPP-4 inhibitor is used for said patient in the same dose as for a patient with normal renal function." Appx227 at 31:56-60. Claims 11-17 recite specific pharmacokinetic properties resulting from administration of DPP-IV inhibitors, *e.g.*, elimination via hepatic metabolism,

excretion via the liver, excretion of the DPP-IV inhibitor "mainly unchanged," elimination primarily as the parent drug, and pharmacologic inactivity of the main metabolite of the DPP-IV inhibitor. Appx227 at 31:61-32:12. Claims 24 and 25 are narrower than claim 1 in that they are specifically directed to treating "2 diabetes mellitus" by "orally administering . . . [linagliptin]." Appx227 at 32:48-65.

### E. Procedural History.

Mylan and Aurobindo filed Abbreviated New Drug Product applications in 2015. Mylan filed for both a standalone linagliptin product, as well as the linagliptin-metformin combination. Appx739 at ¶¶ 67-68. Aurobindo filed only for the standalone linagliptin product. Appx738 at ¶ 59. In response, Boehringer sued for infringement.

Defendants moved for judgment on the pleadings against the '156 Patent, arguing that it was not patent eligible under § 101 because it claimed a law of nature—the excretion of DPP-IV inhibitors primarily through the liver rather than through the kidneys. Appx340-341. Applying the two-step *Mayo* test, the district court granted the motion. Appx92-117. At step one, the court agreed with Defendants that the '156 Patent claims' "specific asserted 'improvement'" was that "DPP-IV inhibitors . . . are mainly excreted via the liver, and only to a minor extent via the kidney." Appx109. The court deemed this improvement to be a "natural biological process" that is "performed at the anatomical level of the human body" and observed that several other claim elements also recited "natural phenomen[a]." Appx109, Appx115. At step two, the district court found that the asserted claims' other elements did not transform the claims

9

into patentable subject matter because they were well-understood, conventional, routine activity. Appx110-116.

The parties proceeded to a seven-day bench trial on the '927 and '859 Patents, at which they presented and examined ten expert and other witnesses. Appx120. Following trial, the district court heard a half-day of closing arguments, and the parties submitted over 700 pages of briefing and materials. After carefully reviewing and weighing the parties' factual arguments, the district court crafted a lengthy, well-reasoned opinion in which it invalidated the asserted claims of the '859 and '927 Patents for obviousness-type double patenting and obviousness. Appx118-175.

On double patenting, the court observed that Boehringer's arguments about whether a skilled artisan would select linagliptin to treat type-2 diabetes were "irrelevant," since "the reference claims themselves recite linagliptin." Appx143. It thus focused on whether the '859 and '927 Patents' claimed 2.5 and 5 mg linagliptin dosages—*i.e.*, the key difference from the reference claims—were obvious in light of the preferred 1-100 mg dosage range disclosed by Boehringer's '510 Publication. Appx141-142.

Agreeing with Defendants, the court found the dosages prima facie obvious for two independent and alternative reasons. First, it determined that the '510 Publication's preferred 1-100 mg range was sufficiently narrow under Federal Circuit precedent to shift the burden of production to Boehringer to offer evidence of secondary considerations or teaching away. Appx145-146, Appx154. Second, the court held that

a skilled artisan could use the 1-100 mg range to arrive at the 2.5 and 5 mg dosages via routine optimization and that the skilled artisan would start at the low end of the range because linagliptin is highly potent according to the '510 Publication. Appx151, Appx154. In reaching these conclusions, the court repeatedly credited the testimony of Defendants' experts, Drs. Accili and Grass. *E.g.*, Appx145-146, Appx147, Appx150, Appx152-153, Appx155-157, Appx166. It also carefully considered the testimony of Boehringer's experts but found their testimony unpersuasive or, in some cases, supportive of Defendants. *E.g.*, Appx124-130, Appx165, Appx168, Appx173.

Separate from its double-patenting analysis, the district court also found the asserted claims prima facie obvious based on the '510 Publication. Appx166. The district court's findings flowed naturally from its double-patenting analysis, since "all of the discussion above in the context of obviousness-type double patenting applies equally with respect to obviousness." Appx163. The district court made one additional, relevant finding: that a skilled artisan would be motivated to study linagliptin from the '510 Publication, which discloses linagliptin as a "preferred" compound and, as stated above, indicates that it is particularly potent. Appx164. In making this finding, the district court considered the testimony of Boehringer's experts and found that it lacked credibility. Appx165.

Finally, the district court determined that Boehringer's evidence of secondary considerations failed to show nonobviousness. First, the evidence showed there was no expectation as to how linagliptin was excreted, and, in any event, any difference was a

matter of degree, not kind. Appx168-170. There was little to no difference in renal excretion between a 5 mg linagliptin tablet and a 25 or 50 mg linagliptin tablet. Appx169. Second, the district court found no unmet need for a type-2 diabetes treatment that did not require dose adjustment. Appx170-172. It based this finding, in part, on testimony by Defendants' expert, Dr. Accili, who observed that certain preexisting drugs also did not require such adjustments. Appx171. The court declined to credit Boehringer's internal company documents that claimed an unmet need because they were poor evidence of whether a skilled artisan saw an unmet need. Appx170-171. Third, the district court found a lack of commercial success for Boehringer's drugs, since their sales ███ of ████████████████████ and were ████ by sales of a ████ product. Appx174-175.

Accordingly, the district court invalidated the '859 and '927 Patents for obviousness-type double patenting and obviousness. Appx175. The district court entered final judgment consistent with this decision on October 15, 2018. Appx176-177. Boehringer timely appealed. Appx788-789.

## SUMMARY OF ARGUMENT

**I.A.** Boehringer attempted to evergreen its earlier-expiring '541 Patent by adding obvious modifications and filing for the '859 and '927 Patents. The district court saw through this attempt and, after weighing all the evidence, invalidated the patents for obviousness-type double patenting and for obviousness. On appeal, Boehringer offers the same arguments and evidence that the district court carefully considered and

rejected. This Court should reject Boehringer's request for a do-over and affirm the decision below.

Boehringer's critique of the post-trial decision starts with a faulty premise: that the selection of linagliptin is relevant to obviousness-type double patenting. It is not. Obviousness-type double patenting starts with a comparison of claims from the earlier-expiring patent against the claims from the later-expiring patents. As the district court held, "determining why a [skilled artisan] would select linagliptin" to treat type-2 diabetes "is irrelevant to the obviousness-type double patenting analysis" because "the reference claims [of the '541 Patent] themselves recite linagliptin." Appx143. Accordingly, Boehringer's repeated complaints about the alleged breadth of the '510 Publication simply do not matter.

The only issue that the district court needed to settle was whether the key difference over the reference claims—the 2.5 and 5 mg dosages of linagliptin recited by the '859 and '927 Patents—was obvious over the prior art. The court correctly held that the dosages were obvious. Those dosages fall within the '510 Publication's preferred 1-100 mg dosage range for DPP-IV inhibitors. Under this Court's precedent, this overlap alone justified shifting the burden of production to Boehringer to offer evidence of teaching away or secondary considerations. *Galderma Laboratories, L.P. v. Tolmar, Inc.*, 737 F.3d 731, 736-38 (Fed. Cir. 2013); *Tyco Healthcare Grp. LP v. Mut. Pharm. Co., Inc.*, 642 F.3d 1370, 1372-73 (Fed. Cir. 2011); *In re Peterson*, 315 F.3d 1325, 1330 (Fed. Cir. 2003).

The district court also made an additional finding that a skilled artisan who read the '510 Publication would have arrived at the 2.5 and 5 mg dosages through a routine dose-ranging study. Appx147-154. The evidence demonstrated that a skilled artisan would have recognized that linagliptin was a particularly potent compound and would have strived to determine the lowest effective dosages for linagliptin. Therefore, in a dose-ranging study, she would have first tested the low-end of the 1-100 mg range and then repeatedly doubled and tested each sequential dose. In doing so, she would have determined that 2.5 and 5 mg dosages would be effective. These findings were not clearly erroneous.

**I.B.** Putting aside the false premise that motivation to select linagliptin is relevant to obviousness-type double patenting, Boehringer's argument fails on its own terms. The factual question of whether a skilled artisan would be motivated to select linagliptin from the '510 Publication was litigated and decided against Boehringer. This issue was a key part of Defendants' obviousness argument, given that it was the one additional finding that distinguished obviousness-type double patenting and obviousness. That finding is strongly supported by the record. Although the '510 Publication lists thousands of DPP-IV inhibitors, it singles out linagliptin as "one of the thirty most particularly preferred compounds" and indicates that linagliptin is particularly potent. Appx164; *see* Appx1533 at ¶¶ 232, 245. These factors would have motivated a skilled artisan to study the compound further and test linagliptin dosages between 1 and 100 mg, the range suggested by the '510 Publication.

**I.C.** Boehringer's secondary-considerations arguments fare no better. Following established Circuit law, the district court shifted the burden of production to Boehringer after reaching its conclusions of prima facie obviousness-type double patenting and obviousness. *E.g.*, *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1353 (Fed. Cir. 2013). The district court considered and rejected Boehringer's evidence of unexpected results, long-felt and unmet need, and commercial success before reaching its ultimate decision on obviousness-type double patenting and obviousness.

**II.** Boehringer's '156 Patent puts a twist on the evergreening strategy exhibited by the '859 and '927 Patents. Like Boehringer's prior publications, the '156 Patent recites the use of DPP-IV inhibitors to treat type-2 diabetes. It adds only one "improvement" over the prior art: the recognition that the human body excretes certain DPP-IV inhibitors mostly through the liver. But this purported improvement is a natural law about the metabolism and excretion of DPP-IV inhibitors. Thus, the '156 Patent's claims suffer from the same flaw called out in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012), and decisions applying it. It is ineligible under § 101.

That conclusion is not affected by *Vanda Pharmaceuticals Inc. v. West-Ward Pharmaceuticals International Ltd.*, 887 F.3d 1117 (Fed. Cir. 2018), or more recent decisions by this Court regarding claims to treatment methods. Those cases do not hold that any claim phrased as a "method of treatment" is automatically patent eligible. That approach that would run afoul of the Supreme Court's admonishment not to turn

patent eligibility into a "draftsman's art." *Mayo*, 566 U.S. at 72. Rather, *Vanda* and recent decisions confirm only that inventive treatment techniques, such as specific and unique dosage regimens, may be patent eligible. The '156 Patent provides no inventive dosage regimen or techniques. Nor does it add any unconventional elements to its recitation of a natural law. As the patent's claims, specification, and Boehringer's own publications show, each element in the asserted claims was already well-known in the industry. The '156 Patent is nothing more than an attempt to extend Boehringer's monopoly over the '541 and '648 Patents by six years—and simultaneously co-opt a natural law that informs doctors' treatment decisions for patients with type-2 diabetes.

## STANDARD OF REVIEW

Boehringer acknowledges that the fact findings underlying the district court's conclusions of obviousness-type double patenting and obviousness are reviewed only for clear error, Boehringer Br. 32-33, but it gives no explanation of what that standard means or how heavy a burden it imposes. A factual finding is clearly erroneous only if this Court is left with the firm conviction that a mistake has been made. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574. Further, the district court's decision to credit Defendants' witnesses over Boehringer's witnesses "can virtually never be clear error." *Id.* at 575. This appeal is not an avenue for Boehringer to retry its case. *See Fromson v. Citiplate, Inc.*, 886 F.2d 1300, 1302 (Fed. Cir. 1989).

The district court's judgment on the pleadings is reviewed under the law of the regional circuit. *Allergan, Inc. v. Athena Cosmetics, Inc.*, 640 F.3d 1377, 1380 (Fed. Cir. 2011). The Third Circuit reviews de novo a grant of judgment on the pleadings. *Hanover Ins. Co. v. Urban Outfitters, Inc.*, 806 F.3d 761, 764 (3rd Cir. 2015). Patent eligibility under § 101 is a question of law based on underlying facts that may be resolved on a motion on the pleadings where the undisputed facts require a holding of ineligibility. *Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 749 (Fed. Cir. 2019).

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY FOUND THAT THE '859 AND '927 PATENTS ARE INVALID.

The governing framework for assessing invalidity is well known. Because a patent is presumptively valid, 35 U.S.C. § 282(a), "the patent challenger bears the burden of proving the factual elements of invalidity by clear and convincing evidence." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007). The burden of proof "never shifts to the patentee to prove validity." *Id.*; *see* Appx135 (district court recognizing the same). That said, "once a challenger introduces evidence that might lead to a conclusion of invalidity—what [this Court] call[s] a prima facie case—the patentee 'would be well advised to introduce evidence sufficient to rebut that of the challenger.'" *Pfizer*, 480 F.3d at 1360 (quoting *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1570 (Fed. Cir. 1986)). The Court refers to this dynamic in short-hand as a "burden of production" upon the patentee. *E.g.*, *Prometheus Labs., Inc. v. Roxane Labs., Inc.*, 805 F.3d

1092, 1102 (Fed. Cir. 2015). The Court has stressed, however, that "this requirement does not in substance shift the burden of persuasion because the presumption of validity remains intact and the ultimate burden of proving invalidity remains with the challenger throughout the litigation." *Pfizer*, 480 F.3d at 1360 (internal quotation marks and citation omitted).

The district court dutifully applied this framework in its post-trial decision and invalidated the asserted claims of the '859 and '927 Patents on two independent and sufficient grounds: obviousness-type double patenting based on the '541 Patent and obviousness based on the '510 Publication. Appx175. Further, the district court rooted its double-patenting analysis in alternative findings that the claimed linagliptin dosages were encompassed by a preferred dosage range revealed in prior art, Appx146, Appx164, and that a skilled artisan could have arrived at the claimed dosages via a routine dose-ranging study, Appx154. Boehringer fails to demonstrate that even one (much less all) of these holdings is wrong. Likewise, Boehringer cannot overcome the district court's rejection of its secondary-considerations evidence by merely repackaging the same arguments it presented below. Because Boehringer comes nowhere close to demonstrating clear error, this Court should affirm.

### A. The Evidence Supports the District Court's Finding that the '859 and '927 Patents Were Prima Facie Invalid for Obviousness-Type Double Patenting.

Obviousness-type double patenting is a "judicially created doctrine that prevents a later patent from covering a slight variation of an earlier patented invention." *Sun*

*Pharm. Indus., Ltd. v. Eli Lilly & Co.*, 611 F.3d 1381, 1384 (Fed. Cir. 2010). The analysis consists of two steps. *Id.* First the court compares the claims in the earlier reference patent with the claims in the later patent and determines any differences. *Pfizer, Inc. v. Teva Pharm. USA, Inc.*, 518 F.3d 1353, 1363 (Fed. Cir. 2008). Second, the court "determines whether those differences render the claims patentably distinct"—that is, nonobvious and novel. *Id.* "'A later claim that is not patentably distinct from,' i.e., 'is obvious over[ ] or anticipated by,' an earlier claim is invalid for obviousness-type double patenting." *Sun*, 611 F.3d at 1385 (quoting *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 968 (Fed. Cir. 2001)). A district court's analysis at the second step rests on factual findings that must be reviewed for clear error. *UCB, Inc. v. Accord Healthcare, Inc.*, 890 F.3d 1313, 1323-24 (Fed. Cir. 2018).

At the first step of the analysis, the district court correctly observed that the reference claims recited the use of linagliptin and metformin in "pharmaceutically effective" amounts to treat type-2 diabetes and, therefore, it was unnecessary to assess whether the prior art discloses these elements. Appx141. In fact, the district court found only two differences between the '541 Patent's reference claims and the '859 and '927 Patents' asserted claims: (1) the specific dosages for linagliptin and metformin; and (2) the manner of administration. Appx142.

Boehringer does not challenge most of the district court's analysis at the second step. Boehringer disputes only the district court's finding that, based on the prior art, the 2.5 mg and 5 mg linagliptin dosages recited in the asserted claims would have been

prima facie obvious over the reference claims in view of the '510 Publication. The district court's two alternative findings on this issue are supported by significant, credible evidence in the record. Nothing in Boehringer's brief establishes a definite and firm conviction that a mistake was made. *UCB,* 890 F.3d at 1324.

### 1. The claimed dosages fall within ranges disclosed by Boehringer's own prior art.

"Ordinarily, 'where there is a range disclosed in the prior art, and the claimed invention falls within that range, there is a presumption of obviousness.'" *Tyco Healthcare Grp. LP v. Mut. Pharm. Co., Inc.*, 642 F.3d 1370, 1372 (Fed. Cir. 2011) (quoting *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1322 (Fed. Cir. 2004)). The presumption is particularly appropriate where the claimed invention does not merely "overlap" with the range in the prior art but is "completely encompassed" by it. *In re Peterson*, 315 F.3d 1325, 1330 (Fed. Cir. 2003). Once the presumption is established, "the burden of production falls upon the patentee to come forward with evidence that (1) the prior art taught away from the claimed invention; (2) there were new and unexpected results relative to the prior art; or (3) there are other pertinent secondary considerations." *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013). The burden of proof, however, always remains on the party challenging the patent. *Id.*

Because the asserted claims' 2.5 mg and 5 mg linagliptin dosages "are completely encompassed" by the dosage range disclosed by Boehringer's '510 Publication, *Peterson*, 315 F.3d at 1330, the district court correctly held that Defendants had made a prima

facie showing of obviousness-type double patenting. The '510 Publication discloses a preferred range of 1-100 mg doses for all the listed DPP-IV inhibitors. Appx1537 at ¶ 0300 ("The dosage required to achieve such an effect is expediently . . . by oral route 1 to 1000 mg, preferably 1 to 100 mg, in each case 1 to 4 times a day."). And the '510 Publication lists linagliptin as one such DPP-IV inhibitor. Appx1533 at ¶¶ 0232, 0245 (listing linagliptin, by chemical name, as a particularly preferred DPP-IV compound); Appx1536 (displaying chart that lists linagliptin as compound 2(142)); Appx1581 at ¶ 02400 (listing linagliptin by chemical name).

The finding that the '859 and '927 Patents' claimed dosages fell within the '510 Publication's preferred range shifted the burden of production to Boehringer. Appx166. Similar overlap triggered the same result in *Galderma*. There, the prior art disclosed acne treatments that contained adapalene in a preferred range of 0.01 to 1 percent, and the asserted claims recited an acne treatment that contained 0.3 percent adapalene. *Galderma*, 737 F.3d at 736-37. Because "the claimed invention [fell] within that range," this Court shifted the burden of production to the patentee without further analysis. *Id.* at 738.

Despite Boehringer's protests that the principles applied in *Galderma* are "limited" or "narrow," Boehringer Br. 46-47, this Court has repeatedly upheld a finding of prima facie obviousness when a dosage fell within similar prior art ranges. *E.g.*, *Tyco*, 642 F.3d at 1372–73 (applying presumption of obviousness to 7.5 mg temazepam dosage based on 5-15 mg prior art range); *Warner Chilcott Co., LLC v. Teva Pharm. USA,*

*Inc.*, 89 F. Supp. 3d 641, 673–74 & n.28 (D.N.J. 2015) (shifting burden of production to patentee based on overlap between patent's 100 mg of EDTA and prior art's 20-175 mg EDTA range), *aff'd*, 642 F. App'x 996 (Fed. Cir. 2016). The district court correctly applied this Court's well-settled precedent and shifted the burden of production to Boehringer.

Faced with the daunting task of demonstrating that the district court's factual findings were clearly erroneous, Boehringer claims those findings "rest[] on legal error." Boehringer Br. 46. In a nutshell, Boehringer contends that *Galderma*'s framework is "a legal principle inapplicable to the facts of this case" because the "prior art discloses a 'very broad' range" that "does not 'invite routine experimentation.'" *Id.* at 46-47 (quoting *Peterson*, 315 F.3d at 1330 n.1). But as Boehringer's own statement suggests, the application of this framework hinges upon "the facts of [the] case" as determined at trial. *Id.* at 46. Specifically, the question of whether a prior-art range is "very broad" or "does not invite routine experimentation" depends upon the skilled artisan's understanding of the prior-art range. Boehringer Br. 47 (quoting *Peterson*, 315 F.3d at 1329 n.1). That is a classic question of fact. *E.g.*, *Source Search Techs., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1069 (Fed. Cir. 2009) (observing that in obviousness analysis, "the characteristics and understanding of an individual of ordinary skill in the relevant field of art at the time of invention" are "factual determinations").

Here, the district court's decision is supported by ample facts. For example, Boehringer's own expert, Dr. Lam, admitted that an even larger range of 2.5–600 mg—

similar to the 25-600 mg range used by Boehringer in its initial dose-ranging study—was not overly broad. Appx146, Appx2125. Similarly, Defendants' expert, Dr. Grass, testified that a skilled artisan would understand the '510 Publication to disclose "a preferable range of 1 to 100 milligrams" by oral route (*e.g.*, a tablet) and that the range would be viewed as narrow, particularly because the range could be addressed by a typical dose-ranging study. Appx1041 at 735:4-13, 736:1-4. The district court cited Dr. Grass's testimony in finding that the 1-100 mg dosage range in the '510 Publication was narrow. Appx145-146; *see also* Appx965 at 523:5-13 (similar testimony of Dr. Accili cited by court).

The cases cited by Boehringer are distinguishable on their facts. In *Genetics Institute, LLC v. Novartis Vaccines & Diagnostics, Inc.*, for example, this Court determined that the facts did "not present the 'typical[ ]' case" in which an overlapping range required shifting the burden of production. 655 F.3d 1291, 1306 (Fed. Cir. 2011). That was so because *Genetics Institute* did not involve the application of a banded prior-art range to a known drug. Rather, the prior art in that case instructed the skilled artisan to delete any combination of at least 581 amino acids from a range of 949 amino acids in order to create a modified protein to treat hemophilia. *Id.* at 1295. The prior art left the skilled artisan to sift through more than 68,000 possible unique combinations to arrive at the claimed invention, with no guidance to select the right combination. *Id.* at 1303-06.

But in this case, a skilled artisan had ample guidance for arriving at the claimed inventions in the '859 and '927 Patents. Boehringer's reliance on *Genetics Institute* is based on a false premise: that because the '510 Publication lists several thousand DPP-IV inhibitors, a skilled artisan would not have been motivated to select linagliptin and apply the preferred dosage range for the treatment of type-2 diabetes. Boehringer Br. 49. But the '541 Patent's reference claims already selected linagliptin, Appx138-139, Appx143, and the '510 Publication provides a narrow, preferred dosage range that applies to linagliptin, Appx1537 at ¶ 300. These differences undercut Boehringer's argument.[2]

Boehringer's reliance on *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293 (Fed. Cir. 2015), fares no better. Boehringer Br. 53. Indeed, *Allergan* is not directly relevant to the issue of overlapping ranges. The Court specifically stated that it "need not decide" whether the range in that case was overly broad because of clear evidence that the prior art taught away from the claimed invention and that the invention exhibited unexpected results. 796 F.3d at 1305. To the extent the Court questioned in *dicta* the breadth of the prior-art range for the two pharmaceutical compounds at issue in that case, it did so based upon "the record," which "show[ed] that the claimed amounts" of those

---

[2] Further, Boehringer's argument fails because the district court made an alternative finding that a skilled artisan would be highly motivated to select linagliptin from the '510 Publication alone. *See infra*, Section I.B. The record in *Genetics Institute* lacked evidence showing a similar motivation. 655 F.3d at 1306 ("Simply put, the typical desire of scientists to find an optimum value within a narrow disclosed range does not apply to the facts of this case." (citation omitted)).

compounds in the challenged patent "could and did materially and unpredictably alter the property of the claimed formulation." *Id.* Thus, *Allergan* underscores the factual nature of determining whether an overlapping range is obvious, and it is factually distinct from this case.

Finally, Boehringer suggests that *Galderma*'s framework applies only "where the [later-expiring] patent claimed an optimization of a prior art range for a drug that was previously known and in use in a dose close to the claimed value." Boehringer Br. 54 (alterations omitted). That argument is doubly wrong. First, Boehringer again glosses over the distinction between obviousness-type double patenting and traditional obviousness. For obviousness-type double patenting, linagliptin was indeed "previously known" and "in use" as a type-2 diabetes treatment in the reference claims of the '541 Patent. Second, there is no requirement that an invention be "in use" in order to trigger a finding of obviousness. "'Prior art' in the obviousness context includes the material identified in section 102(a)," which encompasses not only anything "known or used by others" but also anything "described in a printed publication." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1305 (Fed. Cir. 2006) (quoting 35 U.S.C. § 102(a)); *see also Bayer Pharma AG v. Watson Labs., Inc.*, 874 F.3d 1316, 1326 (Fed. Cir. 2017) ("[T]he motivation to combine inquiry for drug formulations is not limited to what already has or could gain FDA approval."). Thus, it was enough that the '510 Publication disclosed the dosage range.

### 2. A skilled artisan would have arrived at the dosages through a dose-ranging study.

The district court's factual findings regarding the overlapping dosage range were sufficient to establish prima facie obviousness-type double patenting over the reference claims. But the district court went further, supporting its conclusion with a separate finding on routine optimization. Appx150-154. Specifically, the court found that a skilled artisan would have discovered the 2.5 and 5 mg dosages using a routine dose-ranging study. *See Pfizer*, 480 F.3d at 1366-68 (noting that "discovery of an optimum value of a variable in a known process is usually obvious" and finding creation of amlodipine besylate obvious because it was the result of "routine testing"); *Genzyme Therapeutic Prod. Ltd. P'ship v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1365, 1372 (Fed. Cir. 2016) (affirming Board of Patent Appeals' finding that skilled artisan would have arrived at patent's claimed "dosing schedule" for a treatment through routine optimization).

The district court arrived at this conclusion by crediting expert testimony from both sides that skilled artisans would understand how to use dose-ranging studies to determine the correct dosages for a drug. Appx147 ("A [skilled artisan] would be familiar with routine dose-ranging studies, as experts at trial testified that dose-ranging studies were included in general guidelines for FDA approval."); *see* Appx1259 at 1356:7-1357:7 (testimony of Dr. Accili); Appx1158 at 1060:2-5 (testimony of Dr. Lam)). Because the district court's findings turned on "the relative weight given to the testimony of both sides' expert witnesses," *Energy Capital Corp. v. United States*, 302 F.3d

1314, 1329 (Fed. Cir. 2002), this Court "must defer heavily" to these factual conclusions. *Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1379 (Fed. Cir. 2006).

For example, Dr. Grass testified that a skilled artisan conducts a dose ranging study by "starting with a low dose, and sequentially moving through increasing doses," "proceed[ing] with the initial dose and then doubl[ing] and quadrupl[ing]" one dose at a time to evaluate "whether or not there are any limiting side effects," and stopping at "the highest dose unless the trial is terminated because there was some limiting toxicity." Appx147; Appx1037 at 720:6-721:10. And the district court concluded that a 1-100 mg range was not too broad for a dose-ranging study, given that Boehringer's expert testified that an even larger range of 2-600 mg was "not a broad range." Appx1154 at 1044:20-22; Appx146.

Relatedly, the district court determined that a skilled artisan would have started the study at the low end of the 1-100 mg range. The district court supported this finding with testimony from the patents' named inventor, expert testimony, and prior art. First, the district court credited testimony from Boehringer's witness, Dr. Dugi, a named inventor of the '859 and '927 Patents, that drug developers choose the lowest effective dose of a drug because (1) a low dose may result in a smaller, easier-to-swallow tablet; (2) a low dose is easier to formulate in combination pills; (3) a low dose may result in a lower risk of drug-to-drug interactions; and (4) a low dose may reduce the risk of side effects. Appx152-153; Appx1286 at 1464:11-17; Appx1289 at 1476:4-1477:16.

Second, the district court noted that linagliptin's low $IC_{50}$ value disclosed in the '510 Publication indicated that it was particularly potent, a fact that would motivate a skilled artisan to begin the dose-ranging study at the low end of the 1-100 mg range. Appx152-154; Appx1045 at 752:15-18. The district court also relied on Dr. Grass's expert testimony that $IC_{50}$ values are an "important factor" for assessing potency and that linagliptin's $IC_{50}$ value and prior art on less-potent drugs would have made a skilled artisan start her dose-ranging study at the low end of the 1-100 mg range. Appx153-154; Appx1045 at 752:15-18; Appx1046 at 754:13-16. Indeed, the district court expressly noted and relied on Boehringer's slides created by the inventors of the '927 and '859 Patents stating that potency translates to low dose:




Appx150. Finally, as Boehringer pointed out in its opening brief, inventors Dr. Dugi and Dr. Mark testified that dose-ranging studies often start at a low initial dosage that has no clinical effect in order to minimize risk to patients. Boehringer Br. 60 (citing

Appx803-804 at 56:24-57:2; Appx1286 at 1463:23-24). That testimony supports a starting point at the low end of the 1-100 mg range.

For good measure, the district court also indulged Boehringer's contrary argument that a skilled artisan would have started her dose-ranging at 75 mg. The court found that even if a skilled artisan started at 75 mg, she still would have arrived at the claimed dosages. The district court found that, in light of the testimony by the named inventor, Dr. Dugi, a skilled artisan would have been motivated to repeatedly divide the 75 mg dosage in half to determine the lowest effective dosage. Appx152-153.

On appeal, Boehringer seizes upon this alternative holding, complaining "there is no evidence of record" to support this approach. Boehringer Br. 57. Apart from the fact that the district court's holding is supported by testimony from Boehringer's own named inventor,[3] Boehringer fails to acknowledge that this finding was not essential to the district court's analysis. The district court disagreed with Boehringer's premise that a skilled artisan would start dose-ranging at 75 mg. The court's primary finding was that a skilled artisan would instead use the low end of 1-100 mg as a starting point. Appx150-151.

---

[3] Dr. Dugi testified that skilled artisans are motivated to choose the lowest effective dosage in order to create easy-to-swallow tablets, formulate combination pills, and lower risks of drug interactions and side effects. Appx152-153; Appx1286 at 1464:11-17; Appx1289 at 1476:4-1477:16.

When it comes to the district court's principal holding, Boehringer has little to offer beyond a repeat of the same factual points that the district court rejected below. Boehringer argues that a skilled artisan would need to test an "infinite" number of doses between 1 and 100 mg. Boehringer Br. 53. But this argument disregards the Federal Circuit's jurisprudence on overlapping ranges. Mathematically, all ranges have an infinite number of values, including the 0.01-1 percent range in *Galderma* and the 5-15 mg range in *Tyco*. Yet, in both cases, the Court found that values that fell within those ranges were obvious. *Galderma*, 737 F.3d at 737-38; *Tyco*, 642 F.3d at 1373-76.

The Court should also reject Boehringer's argument that a skilled artisan would not have arrived at the exact 2.5 and 5 mg dosages by repeatedly multiplying 1 mg by two. Boehringer's argument incorrectly assumes a skilled artisan would be locked into the confines of exact multiples when designing a dose-ranging study. This is not the law. A "person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). Based on a dose-ranging study, the skilled artisan would understand the full span of possible dosages, not merely the ones that she happened to test.

The evidence supported the district court's two alternative findings: that the preferred dose range was narrow and that the claimed doses would have been reached through dose-ranging studies. This Court should reject Boehringer's claim of clear error where the district court's findings turned on credibility determinations and a weighing of competing evidence. *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1334

(Fed. Cir. 2005) ("[C]redibility determinations by the trial judge can virtually never be clear error." (internal quotation marks omitted)).

**B.    The Evidence Also Supports the Conclusion that the '859 and '927 Patents' Linagliptin Dosages Were Prima Facie Obvious Based on the '510 Publication.**

Separate from its analysis of obviousness-type double patenting, the district court held that the asserted patents were prima facie invalid for traditional obviousness over the '510 Publication. Appx161-166. The court's findings on obviousness tracked its analysis of obviousness-type double patenting with one notable addition:  the court ruled against Boehringer on the issue of motivation to select linagliptin from the '510 Publication. Appx165. Boehringer has not established that this finding was clearly erroneous.

A patent is obvious if "the differences between the subject matter sought to be patented and the prior art" were "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103 (2012).[4]  The ultimate legal conclusion of obviousness is based on underlying factual determinations. "The factual determinations underpinning the legal conclusion of obviousness include 1) the scope and content of the prior art, 2) the level of ordinary skill in the art, 3) the differences between the claimed invention and the prior art, and 4) evidence of

_____

[4] The pre-America Invents Act version of § 103 applies to this case.

secondary factors, also known as objective indicia of non-obviousness." *Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1356 (Fed. Cir. 2008). This Court can reverse a district court's findings on these factors only for clear error. *See Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1160 (Fed. Cir. 2007).

The record at trial strongly supports the district court's finding that a skilled artisan would have applied the preferred dosage range from the '510 Publication to linagliptin. Although the '510 Publication lists thousands of DPP-IV inhibitors, it singles out linagliptin as "one of the thirty most particularly preferred compounds." Appx164; *see* Appx1533 at ¶¶ 0232, 0245. Moreover, linagliptin is one of the six most potent DPP-IV inhibitors listed in the '510 Publication by $IC_{50}$ value. Appx164. Relying on this evidence, the district court concluded that a skilled artisan would have studied linagliptin to treat type-2 diabetes and would have tested dosages within the preferred range of 1-100 mg. Appx165.

Boehringer does not dispute this evidence. It is merely dissatisfied with the conclusion that the district court drew from the evidence. But a bare disagreement with the district court's reasonable fact finding does not amount to clear error. *See Easley v. Cromartie*, 532 U.S. 234, 242 (2001) ("[W]e, like any reviewing court, will not reverse a lower court's finding of fact simply because we would have decided the case differently." (internal quotation marks omitted)). Accordingly, the district court correctly found that the '510 Publication alone also established a prima facie case of invalidity.

## C. The District Court Correctly Assessed and Rejected Boehringer's Evidence of Secondary Considerations.

After finding that Defendants established a prima facie case of invalidity against the '859 and '927 Patents through both obviousness-type double patenting and obviousness, the district court appropriately considered and rejected evidence of secondary considerations. To obtain reversal on this point, Boehringer must prove both that the district court's findings were clearly erroneous and that, as a matter of law, the secondary considerations establish nonobviousness. *See Pfizer*, 480 F.3d at 1372 ("Although secondary considerations must be taken into account, they do not necessarily control the obviousness conclusion."). Faced again with the heavy burden of demonstrating clear error, Boehringer tries again to manufacture legal error in the court's analysis. This effort fails.

Boehringer first argues that, in light of this Court's opinion in *In re Cyclobenzaprine Hydrochloride Extended–Release Capsule Patent Litigation*, 676 F.3d 1063 (Fed. Cir. 2012), the district court erred by finding the '859 and '927 Patents were invalid and then shifting the burden of production for secondary considerations. Boehringer Br. 63. However, in the wake of *Cyclobenzaprine*, this Court has repeatedly affirmed the use of a shifting burden of production once a prima facie case of invalidity is shown. *E.g.*, *ZUP, LLC v. Nash Mfg., Inc.*, 896 F.3d 1365, 1373 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 1211 (2019); *Prometheus Labs., Inc. v. Roxane Labs., Inc.*, 805 F.3d 1092, 1102 (Fed. Cir. 2015); *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1353 (Fed. Cir. 2013).

Contrary to Boehringer's argument, the district court never shifted the burden of *proof* away from the Defendants. Boehringer Br. 63-64. In fact, the district court explicitly stated that "[e]ach of the patents' claims are presumed valid independent of the validity of other claims," that "the patent challenger bears the burden of proving the factual elements of invalidity [of each claim] by clear and convincing evidence," and that "[t]he trial court has the responsibility to determine whether the challenger has met its burden by clear and convincing evidence by considering the totality of the evidence, including any rebuttal evidence presented by the patentee." Appx135 (quoting *Bausch & Lomb, Inc. v. Barnes Hind/Hydrocurve, Inc.*, 796 F.2d 443, 446 (Fed. Cir. 1986); *Pfizer*, 480 F.3d at 1359-60) (internal quotation marks omitted). These statements of law accurately reflect the burden of proof.

Boehringer tries to support its argument with out-of-context quotes from the district court's opinion, combined with the order in which the district court discussed its findings on the overlapping ranges and secondary considerations. Boehringer Br. 63-64. But the secondary-considerations discussion likely comes at the end of the opinion because it applies both to the obviousness-type double patenting and obviousness analyses. Nothing in that section shows that the district court shifted the burden of *proof* to Boehringer. Rather, the discussion of secondary considerations shows that the Court shifted the burden of *production* to Boehringer.

Turning to the facts, the district court correctly assessed the evidence of secondary considerations. First, the district court correctly found no evidence of

unexpected results. In order to demonstrate an unexpected result regarding linagliptin's excretion from the body, Boehringer needed to show that a skilled artisan would have expected some result that would have discouraged her from studying that property of the drug. *See Pfizer*, 480 F.3d at 1371 ("In order to properly evaluate whether a superior property was unexpected, the court should [ ] consider[ ] what properties were expected."). But the district court credited testimony from Defendants' expert, Dr. Accili, and Boehringer's own expert, Dr. Lenhard, that a skilled artisan would not have had any expectation regarding how linagliptin was excreted. Appx168; *see* Appx1113 at 956:22-957:2; Appx1257-1258 at 1350:18-1351:10. The court also relied on testimony from Boehringer's own witness and named inventor, Dr. Mark, that Boehringer had no expectation regarding how linagliptin was excreted and that it did not choose linagliptin based on properties related to excretion. Appx168; *see* Appx819 at 118:7-14. Thus, the court properly rejected Boehringer's argument that linagliptin's high excretion through the liver was unexpected.

The district court also correctly found, in the alternative, that the low renal clearance rate of 2.5 or 5 mg linagliptin dosages would not have been sufficiently unexpected relative to other dosages in the range of 1-100 mg to establish nonobviousness. The district court noted that the label for Tradjenta, Boehringer's standalone linagliptin product, demonstrated that the clearance rate for the claimed 5 mg tablet dosage and unclaimed 25 mg tablet dosage of linagliptin was the same—5

percent.[5] Appx169. Thus, the 5 mg tablet's low renal clearance rate is not an "unexpected property" unique to that dosage. *In re Chupp*, 816 F.2d 643, 646 (Fed. Cir. 1987). And even with a 50 mg tablet, the difference in excretion of 2 percentage points is an insignificant difference in degree, not the substantial "'difference in kind' that is required to show unexpected results." *In re Harris*, 409 F.3d 1339, 1344 (Fed. Cir. 2005); *see In re Merck*, 800 F.2d 1091, 1099 (Fed. Cir. 1986); Appx169.

Second, the district court properly rejected Boehringer's argument that there was a long-felt and unmet need for linagliptin. Boehringer Br. 69-70. To establish this factor, a patentee must show "an articulated identified problem and evidence of efforts to solve that problem." *Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1178 (Fed. Cir. 1993). Boehringer argued below that doctors felt a need for a type-2 diabetes drug, such as linagliptin, whose dosage they did not need to adjust periodically for patients with kidney damage. But the trial evidence undermines this theory.

Dr. Accili testified that doctors could give renally-impaired patients other drugs, like thiazolidinediones (TZDs), without needing to adjust the dose. Appx171; *see* Appx1253-1254 at 1334:17-1335:5. And Boehringer's own documents and 30(b)(6)

---

[5] Boehringer claims "the 5 mg dose has no detectable renal excretion at all for the first 48 hours" as compared to the 5 percent excretion measured from the 25 mg dose. Boehringer Br. 65-66. But this argument compares a 5mg *solution* to a 25mg *tablet*. *Id.* at 66. As the district court found and Boehringer does not contest, the 5mg *tablet* has the same 5 percent renal excretion as the 25mg tablet. Appx169-170. Boehringer made the same argument below, which the district court wisely did not credit.

witness confirmed that physicians did not feel an unmet need for a drug that did not require dose adjustments for their patients. Appx10180, Appx10267, Appx10280; *see* Appx1275 at 1421:6-10; Appx1275 at 1420:13-25; Appx1276-1277 at 1426:16-1427:13.

The district court properly considered and rejected Boehringer's evidence that post-dated the '859 and '927 Patents' priority dates. Appx170-172. Evidence of a long-felt and unmet need must "exist[ ] on the patent's filing date." *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1332 (Fed. Cir. 2009). This principle also nullifies Boehringer's argument that TZDs could potentially harm patients' kidneys and, therefore, could not be used for type-2 diabetes patients. Boehringer Br. 70. As Dr. Accili testified at trial, no one believed at the patents' priority date that TZDs caused harm to patients' kidneys. Appx1262-1263 at 1370:23-1371:19. Therefore, TZDs were, at the time of the priority date, a viable option that did not require dose adjustment. Boehringer's alleged unmet need simply did not exist.

Third, the district court correctly found a lack of commercial success. Appx172-175. This Court has refused to find nonobviousness based on commercial success where sales of a patented drug are "dwarfed" by sales of other drugs. *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1357 (Fed. Cir. 2012). That is the case here: Every month from January 2011 to August 2017, doctors wrote ███████ prescriptions for Januvia (sitagliptin) than for Tradjenta (linagliptin) and Jentadueto (linagliptin+metformin), despite Boehringer's selling its Tradjenta and Jentadueto products ███████████ *See* Appx9175; Appx1239 at 1276:1-25. Thus, the district

court appropriately considered the "modest level of commercial success" and concluded that it did not show nonobviousness. Appx174-175.

Boehringer offered no other relevant evidence to show nonobviousness, such as evidence that the prior art "taught away" from the invention. Because the district court's findings were supported by the record, Boehringer cannot establish clear error in the district court's analysis of secondary considerations.

*  *  *

Boehringer's objections to the district court's post-trial decision are an attempt to relitigate factual disputes that it lost below. But appellate courts are not in the business of second-guessing district-court fact finding. Because the district court's findings are well supported in the record, the district court did not clearly err in invalidating the asserted claims for obviousness-type double patenting or obviousness. This Court should affirm these rulings.

## II.  THE '156 PATENT CLAIMS INELIGIBLE SUBJECT MATTER.

A straightforward application of the Supreme Court's decision in *Mayo Collaborative Services v. Prometheus Laboratories*, 566 U.S. 66 (2012), compels the conclusion that the asserted claims of the '156 Patent are not patent eligible under 35 U.S.C. § 101. The claims at issue are directed to a natural law: certain DPP-IV inhibitors (including linagliptin) are metabolized by the liver rather than the kidney. Other than this natural law, the claims require only conventional administration of these DPP-IV inhibitors in conventional amounts for their conventional purpose—to treat type-2 diabetes. In

short, Boehringer's claims are no more than "an instruction to doctors to apply the [natural] law[ ] when treating their patients" with a known drug. *Id.* at 82.

Boehringer all but admits that the claimed advance is a natural law when it states that the '156 Patent relates to its "discovery" that linagliptin could be used to treat type-2 diabetes in patients with renal impairment. Boehringer Br. 19-20. This "discovery" is purely a consequence of the body's metabolism of these drugs and nothing more. Although this alleged discovery was "years later and after additional research," Boehringer Br. 17, Boehringer's later research and filing of the '156 Patent is a transparent attempt to evergreen its patent portfolio by claiming how the body metabolizes DPP-IV inhibitors, coupled with conventional administration of known drugs for their known purpose. In fact, the '156 Patent expires nearly *six years* beyond the expiration of Boehringer's foundational patents, which claim certain DPP-IV inhibitors, including linagliptin, and linagliptin's use in the treatment of type-2 diabetes. Appx202. The '156 Patent thus withdraws a known treatment modality from the public.

The '156 Patent claims do not survive the *Mayo* test, and this Court should affirm the district court's judgment that the asserted claims are not patentable under § 101.

## A. The Asserted Claims Are Directed to the Natural Law that Certain DPP-IV Inhibitors Are Metabolized by the Liver.

### 1. The claims and specification of the '156 Patent demonstrate that the claimed "advance" over the prior art is a natural law.

In the first step of the *Mayo* test, the Court identifies the patent's "claimed advance over the prior art." *Affinity Labs of Tex., LLC v. DirecTV, LLC*, 838 F.3d 1253,

1257 (Fed. Cir. 2016). In conducting this inquiry, the Court may look "to the specification to understand 'the problem facing the inventor' and, ultimately, what the patent describes as the invention." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019). Then, the Court determines whether the claimed advance is a patent-ineligible concept, like a law of nature. *Affinity*, 838 F.3d at 1257; *see Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 751 (Fed. Cir. 2019) (concluding that patent was "directed to a natural law because the claimed advance was only in the discovery of a natural law"); *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1375 (Fed. Cir. 2016) (reading *Mayo* to require focus on "claimed advance over the prior art").

Here, the '156 Patent's "claimed advance over the prior art" is the inventors' "discovery" that certain DPP-IV inhibitors can be administered to patients with renal disease, dysfunction, or impairment without dose adjustment because, unlike metformin, they are eliminated mainly by the liver rather than the kidney. Boehringer does not appear to dispute this. Boehringer Br. 19-20. As the district court correctly noted, this is a "natural biological process" that is "performed at the anatomical level of the human body." Appx109.

The claim language itself establishes that this discovery is the very essence of the claims. Claim 10 specifically recites the renal conditions that prevent administration of drugs metabolized by the kidney and requires use of the same dose of DPP-IV inhibitor as for patients with normal renal function. Appx227 at 31:56-60. Claims 24 and 25 have

essentially the same focus, although they say nothing regarding lack of dose adjustment.[6] Appx227 at 32:48-65. Accordingly, the claims are "directed to" the body's metabolism of DPP-IV inhibitors. Dependent Claims 11-17 make this even clearer by specifying the particular metabolic responses of the body. Appx227 at 31:61-32:13. For example, dependent Claim 11 is directed to elimination of the DPP-IV inhibitor via hepatic metabolism or biliary excretion; Claim 12 is directed to excretion of the DPP-IV inhibitor mainly via the liver; and Claim 13 is directed to excretion of the DPP-IV inhibitor via the kidney representing a minor elimination pathway. Appx227 at 31:61-32:2. These pharmacokinetic consequences of administration are undeniably natural processes. Even Boehringer admits this. Boehringer Br. 17-18 (acknowledging "claims 11-17 recite particular excretion and pharmacokinetic outcomes" of administering DPP-IV inhibitors).

The specification of the '156 Patent confirms that the "advance over the prior art" is the pharmacokinetic outcome of administering DPP-IV inhibitors. It states that "it has now surprisingly been found that DPP-4 inhibitors as defined herein have surprising and particularly advantageous properties" that make them useful when metformin cannot be used, *i.e.*, when the patient has "impaired renal functioning."

---

[6] Claims 24 and 25 are specifically limited to diabetes mellitus type II (rather than "metabolic diseases") and linagliptin administration (rather than all DPP-IV inhibitors).

Appx216 at 9:30-41; Appx218 at 13:7-8. The specification goes on to describe these properties, which are that:

- the DPP-IV inhibitor is substantially or mainly excreted by the liver, Appx218 at 13:45-52;

- the DPP-IV inhibitor is excreted mainly unchanged as parent drug, Appx218 at 13:53-59;

- the main metabolite(s) is/are pharmacologically inactive, Appx218 at 13:60-66; and

- there is non-substantial or only minor excretion by the kidney, Appx218 at 14:28-40.

These "properties" *all* consist of pharmacokinetic observations—metabolism and excretion of DPP-IV inhibitors by the human body. The specification also describes the pharmacokinetic studies the inventors used to measure these properties "in a human subject." Appx225 at 28:42-67. Thus, the specification demonstrates that the claimed advance of the '156 Patent over the prior art is merely "newly discovered information about human biology." *Genetic Techs.*, 818 F.3d at 1376; *see also Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 591-93 (2013) (noting "Myriad's patent descriptions highlight the problem with its claims," in view of specification touting the "discovery" of the location of the BRCA1 and BRCA2 genes).

The specification also makes clear that the claimed step of administering DPP-IV inhibitors to treat type-2 diabetes is *not* the advance over the prior art, because it nowhere describes that step as inventive. To the contrary, the specification incorporates

by reference over twenty prior-art references collectively teaching the administration of DPP-IV inhibitors, including linagliptin, to treat type-2 diabetes. Appx213 at 4:14-24; Appx213-216 at 4:24-9:26; *see Athena*, 915 F.3d at 751 (holding that where the specification highlights the discovery of a natural law, and remaining steps are conventional, claims are "directed to" the natural law).

Boehringer fixates on the district court's statement that the '156 Patent claims are directed to "an abstract idea." Boehringer Br. 34-39. Boehringer's criticism is hollow, given that this Court's review is de novo, and it "sits to review judgments, not opinions." *Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016) (alternations and internal quotation marks omitted); *see also Palantir USG, Inc. v. United States*, 904 F.3d 980, 990 (Fed. Cir. 2018). Here, the district court's judgment—holding the '156 Patent ineligible under § 101—is correct.

Indeed, the same analysis applies under *Mayo* regardless of whether the claims are directed to abstract ideas or natural laws. The district court assessed whether the asserted claims were directed to patent-ineligible subject matter and recognized that the only improvement disclosed in the '156 Patent was that the disclosed DPP-IV inhibitors "are mainly excreted via the liver, and only to a minor extent via the kidney, in order to treat the targeted patient population." Appx109. The district court correctly found that this claimed advance was a natural law, even if the court did not specifically label it as such. *See Athena*, 915 F.3d at 750 n.3 (declining to resolve whether district court

correctly characterized claim because court "agree[d] with [appellee's] identification of the natural law"). This Court should affirm that conclusion.

### 2. Unlike the patent-eligible claims in **Vanda** *and its progeny, the '156 Patent claims are not directed to a novel treatment.*

Boehringer attempts to analogize its claims to those held to be patent eligible in *Vanda*, Boehringer Br. 37, but this analogy fails. Unlike the claims at issue in *Vanda*, which were found to be "directed to a *novel* method of treating a disease," 887 F.3d at 1134 (emphasis added), Boehringer's claims contain no such novel method steps. Specifically, the majority found that the patent in *Vanda* claimed "a new way of using an existing drug" through a specific "dosage regimen" based on a relationship between metabolism and genotype. *Id.* at 1135. The patent in *Vanda* instructed doctors to "'internally administer[ ] iloperidone to the patient in an amount of 12 mg/day or less' if the patient has a CYP2D6 poor metabolizer genotype; and 'internally administer[ ] iloperidone to the patient in an amount that is greater than 12 mg/day, up to 24 mg/day' if the patient does not have a CYP2D6 poor metabolizer genotype." *Id.* The Court found these "treatment steps" distinguished the patent from the *Mayo* patent, which only "stated that the metabolite level in blood simply 'indicates' a need to increase or decrease dosage, without prescribing a specific dosage regimen or other added steps to take as a result of that indication." *Id.*

In contrast, the '156 Patent claims do not claim "a specific dosage regimen or other added steps" for treatment. *Id.* Thus, those claims do not offer a "new way of

using an existing drug." *Id.* Indeed, Claim 10 merely tells doctors that they can continue using whatever dose they choose for renally-impaired patients as for other patients. This is not a new method of treatment, but a consequence of the natural law to which the claims are directed, *i.e.*, the body's metabolism of DPP-IV inhibitors. And Claims 11-17 and 24-25 do not require any particular dosage at all. Boehringer has not identified any aspect of the claimed treatment steps that represent an advance in the art—because there is none. *Vanda* is therefore inapposite.[7]

This Court's recent decisions in *Natural Alternatives International, Inc. v. Creative Compounds, LLC*, 918 F.3d 1338 (Fed. Cir. 2019), and *Endo Pharmaceuticals Inc. v. Teva Pharmaceuticals USA, Inc.*, 919 F.3d 1347 (Fed. Cir. 2019), also do not support Boehringer's argument that its claims are patent-eligible.[8] In both *Natural Alternatives* and *Endo*, the Court found that the claims at issue were not "directed to" a natural law that is a consequence of how a compound is metabolized by the body, but directed to novel methods of treatment based on the claimed requirement for administration of a specific dosage. In *Natural Alternatives*, the patent "cover[ed] using a natural product"—

---

[7] A cert petition was filed in *Vanda* seeking Supreme Court review. The Defendants reserve their rights to seek further review based on the disposition of that petition.

[8] Below, Defendants cited to the lower court decision which was reversed in *Endo*. In holding the '156 Patent invalid, the district court did not rely on that decision. In any event, Defendants' point below was that the claims in *Endo* contained more than the '156 Patent claims at issue, so if the *Endo* claims were invalid under § 101, the '156 Patent claims were invalid as well. The fact that the *Endo* claims were later held to be patent eligible thus does not change the strong case of patent ineligibility of the '156 Patent claims, as discussed herein.

beta-alanine—in "*unnatural quantities*," and it provided "*specific dosages*" with which to treat patients. 918 F.3d at 1346 (emphasis added). Similarly, in *Endo*, "the inventor discovered that patients with moderately or severely impaired kidney function need *less oxymorphone than usual* to achieve a similar level of pain management" and this discovery resulted in treatment of these patients "in a *new, different way* than other patients." 919 F.3d at 1349 (emphasis added).

The '156 Patent claims do not fit this mold for patentable subject matter because they do not recite a novel method of treatment or a new dosage regimen. Instead, they claim the same method of treatment and same dosage regimen as the known method of administering DPP-IV inhibitors. Because their only novel element is a law of nature, the claims will "tie up [a] doctor's subsequent treatment decision" by foreclosing basic, conventional methods of treating type-2 diabetes with DPP-IV inhibitors. *Mayo*, 566 U.S. at 86. This is the concern that § 101 is supposed to guard against. *Id.* at 86-87. The '156 Patent claims do no more than "simply recite a law of nature and then add the instruction 'apply the law.'" *Id.* at 78.

### 3. Boehringer's argument that claims to "methods of treatment" are per se patentable is contrary to law.

Boehringer attempts to distinguish the '156 Patent claims from those found to be ineligible in *Mayo* by arguing that the '156 Patent claims recite a method of treatment rather than merely setting forth "a method for observing a natural correlation." Boehringer Br. 35. This argument, which assumes a per se rule of patentability for

method-of-treatment claims, has no merit and is directly contradicted by applicable Supreme Court precedent.

*First*, administration of a drug in a method of treatment claim is "post-solution activity" that does not render a claim patent-eligible, where, as here, that post-solution activity is conventional. *See Parker v. Flook*, 437 U.S. 584, 589-90, 593 (1978). As Boehringer would have it, words like "treat" or "treatment" are talismans that exempt claims including these words from § 101 scrutiny. But that is not the law. *Id.* at 593 (rejecting as "untenable" patentee's argument that a process claim that implements a principle "in some specific fashion" is "automatically" patentable subject matter).

*Second*, in the Federal Circuit decision from which the Supreme Court granted *certiorari* in *Mayo*, the court agreed with the patentee's argument that the method-of-treatment claims at issue were patentable because "claims to methods of treatment . . . are always transformative when [a drug] is administered to the body to ameliorate the effects of an undesired condition." *Prometheus Labs., Inc. v. Mayo Collaborative Servs.*, 628 F.3d 1347, 1356 (Fed. Cir. 2010), *rev'd*, 566 U.S. 66 (2012). The Supreme Court *rejected* this approach to the § 101 analysis, stating that the "administering" step (which is necessarily present in every "method of treatment" claim) is *irrelevant* to determining whether the claims are "directed to" a law of nature. *Mayo*, 566 U.S. at 88 ("[T]he 'administering' step simply helps to pick out the group of individuals who are likely interested in applying the law of nature.").

Boehringer also relies on dicta in *Rapid Litigation Management Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042 (Fed. Cir. 2016), to suggest a per se rule applies. Boehringer Br. 36. But contrary to Boehringer's argument, the court in *CellzDirect* did *not* endorse a per se rule for "a method of doing something" but instead conducted both steps of the *Mayo* analysis in reaching its conclusion that the claims were directed to a "new and useful laboratory technique" and, therefore, patent eligible. *Id.* at 1047-52.

Indeed, neither this Court, nor its predecessor, has endorsed per se rules of patent-eligibility in *any* context. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1374 (Fed. Cir. 2011) ("Regardless of what statutory category ('process, machine, manufacture, or composition of matter') a claim's language is crafted to literally invoke, *we look to the underlying invention for patent-eligibility purposes*." (emphasis added) (citation omitted)); *In re Sarkar*, 588 F.2d 1330, 1333 (C.C.P.A. 1978) ("[S]emantogenic considerations preclude a determination based solely on words appearing in the claims."). There is no reason to abandon this long-standing precedent to create new law for claims drafted to recite a "method of treatment."

**B.     The Asserted Claims are Unpatentable at Step Two of *Mayo*, Because the Claimed Method Steps Add Only the Conventional Administration of DPP-IV Inhibitors.**

**1.     *Boehringer's specification teaches that oral administration of DPP-IV inhibitors to treat type-2 diabetes is conventional.***

If the *Mayo* analysis reveals that a claim is "directed to" ineligible subject matter at step one, the court must proceed to step two to determine whether the claims

nevertheless embrace an "inventive concept," *i.e.*, "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to *significantly more* than a patent upon the ineligible concept itself." *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014) (emphasis added) (internal quotation marks and alterations omitted). "Simply appending conventional steps, specified at a high level of generality," is not enough to supply an inventive concept. *Mayo*, 566 U.S. at 82. More specifically, "[f]or process claims that encompass natural phenomenon, the process steps are the additional features that must be new and useful." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1377 (Fed. Cir. 2015).

As discussed above, Boehringer's claims encompass the human body's route of metabolizing linagliptin and other DPP-IV inhibitors, which is a purely natural phenomenon. Thus, *Mayo* step two looks to the process steps to determine whether they are "conventional," or, alternatively, "new and useful." *Id.*

The single process step of each and every asserted claim of the '156 Patent requires "orally administering" a DPP-IV inhibitor (Claims 10-17) or linagliptin (Claims 24-25) to a patient to treat a "metabolic disorder" (Claims 11-17) or "type 2 diabetes mellitus" (Claims 10, 24, 25) in the patient. Appx227. The district court correctly recognized these "additional features" were well-understood, routine, conventional activity that did not transform the claims into patent-eligible subject matter. Appx110-116.

The '156 Patent specification incorporates by reference numerous publications that show that "orally administering" DPP-IV inhibitors, including linagliptin, to treat "metabolic diseases, particularly type 2 diabetes mellitus," Appx216 at 10:14, was conventional, routine, well-understood activity that predated the '156 Patent. *See* Appx213-216 at 4:15-9:26; Appx219 at 16:35-52. Specifically, it incorporates publications about known (and in some instances commercially marketed) DPP-IV inhibitors, like sitagliptin, vildagliptin, saxagliptin, and alogliptin. Appx213-216 at 4:15-9:26; *see* Appx213 at 4:59-60. With respect to linagliptin, the specification incorporates publication WO2004/018468, which predates the '156 Patent by four years and discloses use of linagliptin and DPP-IV inhibitors to treat "type 1 and type 2 diabetes mellitus." Appx213 at 4:15-18, Appx216 at 9:27-29; Appx10136, Appx10149, Appx10153, Appx10158-10159 (English translation of WO2004/018468 listing linagliptin as compound (13)).

Further, to the extent that the language in the claims relating to administering DPP-IV inhibitors to patients for whom "metformin therapy is inappropriate" is not viewed simply as a restatement of the natural law (which it is), the specification admits that metformin was a known treatment for type-2 diabetes and was contraindicated in patients with renal disease or renal impairment. Appx212 at 1:51-67. Thus, Boehringer's specification "plainly concede[s] that each of the process steps was well-known in the art." *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 760 F. App'x 1013, 1019 (Fed. Cir. 2019).

Again, *Mayo* is highly instructive. In *Mayo*, in addition to the natural law, the claims recited an "administering" step, a "determining" step, and a "wherein" step. *Mayo*, 566 U.S. at 78. The Court analyzed these steps and concluded that they were not sufficient to transform the nature of the claim. *Id.* at 78-79. If a conventional administration step combined with other process steps was insufficient to transform a claim into patentable subject matter in *Mayo*, an administration step alone—as in the '156 Patent—must also be insufficient.

Indeed, administration of DPP-IV inhibitors to patients with renal insufficiency is, at best, "limit[ing] the use of the [natural law] to a particular technological environment" and thus ineligible. *Diamond v. Diehr*, 450 U.S. 175, 191 (1981). Moreover, once Boehringer discovered that linagliptin is metabolized by the liver, rather than the kidney, administering linagliptin to patients with abnormal renal function was nothing other than "a simple step" that does not impart patent eligibility. *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 132 (1948) ("But once nature's secret of the non-inhibitive quality of certain strains of the species of Rhizobium was discovered, the state of the art made the production of a mixed inoculant a simple step.")

In this regard, the claims at issue preempt conventional medical practice— treating diabetic patients with renal impairment with a type of drug known to be safe for patients with renal impairment. The claims thus "threaten to inhibit the development of more refined treatment" by preempting the use of any DPP-IV inhibitor (including linagliptin) to treat metabolic disorders, such as type-2 diabetes,

based on a natural phenomenon—the manner in which that DPP-IV inhibitor is metabolized by the body. *Mayo,* 566 U.S. at 87. This is yet another indication that the claims are not patent eligible. *See id.* at 86-87.

Before the district court, Boehringer never disputed that the use of DPP-IV inhibitors, including linagliptin, to treat type-2 diabetes was conventional. But Boehringer now argues on appeal that the claimed method step reciting treatment of type-2 diabetes with linagliptin was not conventional because "linagliptin was not FDA-approved or in use beyond experimental clinical trials prior to the filing date of the '156 Patent."[9] Boehringer Br. 42.

This argument fails for three reasons. *First,* this argument is waived because it was not presented to the district court. *Metro. Edison Co. v. Pa. PUC,* 767 F.3d 335, 352 (3rd Cir. 2014) ("[F]ailure to raise an issue in the district court constitutes a waiver of the argument." (internal quotation marks omitted)); *see also Athena,* 915 F.3d at 756. *Second,* Boehringer points to no case that requires that a drug be FDA-approved before it becomes well understood, routine, or conventional. *Third,* and in any event, there is simply no *relevant* evidence in the record that administering DPP-IV inhibitors to treat type-2 diabetes is anything other than conventional. Boehringer's only "evidence" that the claimed method was "inventive" was the declaration testimony of its expert, Dr.

---

[9] This argument ignores that asserted claims 10-17 are not limited to treatment with linagliptin.

Pajvani. However, Dr. Pajvani's testimony—that "the claimed invention does not require dose adjustment in patients with any degree of renal impairment" and "does not require regular monitoring of renal function," Appx414—is irrelevant because those advantages depend entirely on the natural law that DPP-IV inhibitors are metabolized by the liver. *See BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018) ("[A] claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept.").

Thus, the inventors' admissions in the specification compel a conclusion that administration of DPP-IV inhibitors (including linagliptin) to treat type-2 diabetes is well-understood, routine, conventional activity. The district court's dismissal of the asserted claims of the '156 Patent was therefore correct. "There is no reason to task the district court with finding an inventive concept that the specification and prosecution history concede does not exist." *Cleveland Clinic*, 760 F. App'x at 1019.

### 2. There were no relevant factual disputes that precluded dismissal on the pleadings.

Boehringer argues that the district court "improperly ignored factual disputes regarding whether linagliptin and its claimed uses were well-known, understood, and conventional in the art." Boehringer Br. 29. According to Boehringer, the alleged factual disputes are based on evidence it provided to the district court that the claimed method

was "inventive" because it permitted treatment of type-2 diabetes without renal monitoring or dose adjustment. Boehringer Br. 41-43.

Boehringer's argument fails for two reasons. *First*, Boehringer cannot manufacture a factual dispute with legally irrelevant facts. As discussed above in Section II.B.1., the alleged "inventiveness" of the claims discussed by Dr. Pajvani is the ineligible subject matter and thus cannot supply the inventive concept. *BSG*, 899 F.3d at 1290-91. Moreover, an expert declaration cannot raise a factual issue sufficient to preclude dismissal if it is inconsistent with admissions in the patent specification. *Athena*, 915 F.3d at 756.

*Second*, Boehringer did not raise any factual dispute about its admissions in the specification, which are dispositive here. Specifically, the '156 Patent does not describe the claimed administration step as unconventional. Accordingly, *Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018), cited by Boehringer, does not support its position. Unlike the '156 Patent's specification, the specification at issue in *Berkheimer* described certain improvements to conventional method steps. *Id.* at 1369. The court looked to the claims to determine whether the claims embodied those improvements. The claims that did not embody the improvements were held ineligible under § 101, while those that encompassed the improvements required fact-finding and, therefore, were appropriately not dismissed from the case. *Id.* at 1370. Following this reasoning,

fact-finding was not needed here because the '156 Patent specification does not describe the step of administering linagliptin/DPP-IV inhibitors as "an improvement."[10]

*Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121 (Fed. Cir. 2018), is simply inapplicable. Boehringer Br. 40-41. In *Aatrix*, certain allegations in the second amended complaint raised factual questions as to the eligibility of the claimed subject matter. 882 F.3d at 1126-27. Here, however, Boehringer has never argued that allegations in its complaint raise factual disputes relevant to the § 101 analysis.

In a last-ditch effort to raise a factual dispute where there is none, Boehringer argues that when Defendants sought to amend their invalidity contentions, they related the § 101 analysis to the obviousness analysis to argue that Boehringer would not be prejudiced. Boehringer Br. 43. Defendants' arguments in this regard are of no moment. This Court has recognized that the § 101 inquiry "might sometimes overlap" with fact-intensive inquiries "like novelty under § 102." *Berkheimer*, 881 F.3d at 1368 (quoting *Mayo*, 566 U.S. at 90). This axiom does not, by itself, establish that Boehringer raised a factual dispute precluding dismissal. "[N]ot every § 101 determination contains genuine disputes over the underlying facts material to the §101 inquiry. . . ." *Id.* This is one such case. Accordingly, the district court properly held that the '156 Patent is ineligible on the pleadings.

---

[10] A cert petition was filed in *Berkheimer* seeking Supreme Court review. The Defendants reserve their rights to seek further review based on the disposition of that petition.

## CONCLUSION

The Court should (i) affirm the district court's judgment that the '859 and '927 Patents are invalid for obviousness-type double patenting and obviousness and (ii) affirm the district court's judgment that the '156 Patent is ineligible under § 101.

Corrected: July 1, 2019

Respectfully submitted,

/s/ Jeffrey S. Ward
Jeffrey S. Ward
Wendy M. Ward
GREEN, GRIFFITH & BORG-BREEN LLP
8215 Greenway Blvd. – Suite 220
Middleton, WI 53562
Tel.: 312-883-800
jward@greengriffith.com
wward@greengriffith.com

Paige Stradley
MERCHANT & GOULD P.C.
80 S. Eighth Street – Suite 3200
Minneapolis, MN 55402
Tel.: 612-336-4671
pstradley@merchantgould.com

*Counsel for Aurobindo Pharma Ltd. and
Aurobindo Pharma USA, Inc.*

/s/ Deepro R. Mukerjee
Deepro R. Mukerjee
Lance A. Soderstrom
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022
Tel.: 212-940-6330
deepro.mukerjee@kattenlaw.com
lance.soderstrom@kattenlaw.com

Howard R. Rubin
Eric T. Werlinger
Rajesh R. Srinivasan
KATTEN MUCHIN ROSENMAN LLP
2900 K Street, NW – Suite 200
Washington, DC 20007
Tel.: 202-625-3500
howard.rubin@kattenlaw.com
eric.werlinger@kattenlaw.com
rajesh.srinivasan@kattenlaw.com

Joseph M. Janusz
KATTEN MUCHIN ROSENMAN LLP
550 South Tryon St. – Suite 2900
Charlotte, NC 28202
Tel.: 704-444-2000
joseph.janusz@kattenlaw.com

*Counsel for Mylan Pharmaceuticals Inc.,
Mylan Inc., and Mylan Laboratories Ltd.*

Thomas J. Parker
Christopher L. McArdle
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
Tel: 212-210-9400
thomas.parker@alston.com
chris.mcardle@alston.com

*Counsel for Mylan Pharmaceuticals Inc., Mylan Inc., and Mylan Laboratories Ltd.*

.

# CERTIFICATE OF SERVICE

We hereby certify that we had the nonconfidential version of the Corrected Brief of Appellees electronically filed by tendering it via the CM/ECF system to the Office of the Clerk of the United States Court of Appeals for the Federal Circuit on July 1, 2019. We certify that all counsel of record are registered ECF filers and that they will be served by electronic means via the CM/ECF system. We certify that, under Federal Circuit Rule 28(d)(3), we had the confidential version of the Corrected Brief of Appellees electronically filed by tendering it via the CM/ECF system to the Office of the Clerk of the United States Court of Appeals for the Federal Circuit on July 1, 2019, two paper copies were sent to Appellant's principal counsel at the address below, and electronic courtesy copies were sent to the email addresses below:

> Leora Ben-Ami
> Jeanna M. Wacker
> Mira A. Mulvaney
> KIRKLAND & ELLIS LLP
> 601 Lexington Avenue
> New York, New York 10022
> leora.benami@kirkland.com
> jeanna.wacker@kirkland.com
> mira.mulvaney@kirkland.com

Non-corrected versions of the brief were originally filed and served on June 17, 2019.

Date: July 1, 2019

/s/ Jeffrey S. Ward
Jeffrey S. Ward

*Counsel for Aurobindo Pharma Ltd. and Aurobindo Pharma USA, Inc.*

/s/ Deepro R. Mukerjee
Deepro R. Mukerjee

*Counsel for Mylan Pharmaceuticals Inc., Mylan Inc., and Mylan Laboratories Ltd.*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

Pursuant Federal Circuit Rule of Practice 32(a) and Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6), we hereby certify that this corrected brief is in compliance with the type form and volume requirements. Specifically, the Corrected Brief of Appellees is proportionately spaced; uses a Roman-style, serif typeface (Garamond) of 14-point; and contains 13,808 words, exclusive of the material not counted under Rule 32(f) of the Federal Rules of Appellate Procedure.

Date: July 1, 2019

/s/ Jeffrey S. Ward
Jeffrey S. Ward

*Counsel for Aurobindo Pharma Ltd. and*
*Aurobindo Pharma USA, Inc.*

/s/ Deepro R. Mukerjee
Deepro R. Mukerjee

*Counsel for Mylan Pharmaceuticals Inc.,*
*Mylan Inc., and Mylan Laboratories Ltd.*

**CERTIFICATE OF COMPLIANCE FOR BRIEFS
CONTAINING MATERIAL SUBJECT TO A PROTECTIVE ORDER**

This corrected brief complies with the limitations of Fed. Cir. R. 28(d) and contains 15 words marked as confidential.

Date: July 1, 2019

/s/ Jeffrey S. Ward                     /s/ Deepro R. Mukerjee

Jeffrey S. Ward                            Deepro R. Mukerjee

*Counsel for Aurobindo Pharma Ltd. and*    *Counsel for Mylan Pharmaceuticals Inc.,*
*Aurobindo Pharma USA, Inc.*              *Mylan Inc., and Mylan Laboratories Ltd.*